T.C. Memo. 2009-52

UNITED STATES TAX COURT

ROSE MARIE SUNLEAF, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12380-05.                    Filed March 11, 2009.

<u>Timothy J. Krumm</u>, for petitioner.

<u>Michael W. Bitner</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  This case arises from a request for relief under section 6015(f)[1] with respect to petitioner's 2000 taxable year.  The issues for decision are:  (1) Whether our review is limited to the administrative record as of the date respondent's

_____

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code.

determination denying petitioner's request for section 6015 relief was issued; and (2) whether respondent abused his discretion in denying petitioner relief under section 6015(f) for 2000.

FINDINGS OF FACT

I.  Procedural Background

Petitioner is the widow of Roger W. Sunleaf (Mr. Sunleaf), who died on September 14, 2003.  After Mr. Sunleaf's death petitioner discovered he had not been paying their joint Federal income taxes or Federal employment taxes, and they owed the Internal Revenue Service (IRS) $131,494.30.  Of this amount approximately $106,268.31 was from underpayments, including interest and penalties, of Federal income tax for the years 1993, 1994, 1995, 1996, and 2000.

Petitioner requested section 6015 relief.  Petitioner submitted to the IRS Form 8857, Request for Innocent Spouse Relief, dated April 26, 2004; Form 12510, Questionnaire for Requesting Spouse, dated April 26, 2004; and an undated letter explaining her circumstances and the reasons she was entitled to relief pursuant to section 6015.

Respondent denied petitioner section 6015(f) relief in an October 1, 2004, letter.  Respondent's workpapers showed that he denied section 6015(f) relief for 2000 because petitioner's claim was not timely.  Respondent claimed the first collection activity

with respect to the liability for 2000 was made on July 16, 2001, and petitioner's request for section 6015(f) relief was untimely because it was made more than 2 years from the first collection activity. Petitioner filed a Form 12509, Statement of Disagreement, on November 1, 2004.

In a letter dated February 7, 2005, respondent informed petitioner that he was reconsidering petitioner's request for section 6015(f) relief for 2000. In a final determination dated April 13, 2005, respondent denied petitioner's request for section 6015(f) relief for 2000 on the ground, among others, that petitioner did not have reason to believe at the time the return was filed that the tax would be paid by Mr. Sunleaf.

Petitioner petitioned this Court on July 6, 2005, requesting section 6015(f) relief for 2000. At the time of filing her petition, petitioner resided in Iowa. As of December 31, 2007, the amount of the 2000 tax liability in dispute was $9,505.53; $5,413 is the amount of the underpayment and $4,092.53 is the amount of interest and penalties.

II.  Substantive Background

Petitioner and Mr. Sunleaf timely filed a joint income tax return for 2000. Mr. Sunleaf prepared the 2000 return, which petitioner signed without prior review. It was Mr. Sunleaf's practice to fill out the couple's income tax return and present it to petitioner for her signature a few minutes before the post

office closed on the day the return was due.  This practice prevented petitioner from reviewing their 2000 joint income tax return because she was rushed and pressured into signing the return.

Petitioner was 70 years old at the time of trial (February 27, 2008).  She and Mr. Sunleaf were married in 1965 and lived in Montezuma, Iowa, for approximately 40 years.  At the time of trial, the population of Montezuma was approximately 1,400. Petitioner graduated from Finley Hospital Nursing School and worked as a nurse until 1966 when a back injury forced her to stop working.  She lost her certification as a nurse in 2004. Mr. Sunleaf graduated from the University of Iowa School of Law in 1963, started working as an attorney in Montezuma, and worked as an attorney in Montezuma for the duration of his life.

Petitioner and Mr. Sunleaf had a wonderful life together. Mr. Sunleaf worked in his law practice, and petitioner took care of the family home.

Petitioner and Mr. Sunleaf had a joint checking account. Petitioner never saw the bank statements for this account and used the account only rarely when Mr. Sunleaf gave petitioner a check to buy something for the house.  The joint account was managed by Mr. Sunleaf and primarily used to pay for the expenses he handled.

During their marriage petitioner had a personal bank account she used to pay for Christmas presents and later (once she started to receive Social Security benefits) to pay for groceries and prescription drugs. The money in petitioner's personal account came from gifts to petitioner from her family and from Social Security benefits. The expenses for groceries and drugs usually used up petitioner's Social Security benefits.

When she signed the joint income tax return for 2000, petitioner was unaware of any financial problems she and Mr. Sunleaf may have had. Petitioner was unaware of whether Mr. Sunleaf ever borrowed any money. Mr. Sunleaf did not speak to petitioner about money and finances. When the topic of taxes came up, Mr. Sunleaf told petitioner he would handle it, and petitioner did not ask any questions about the joint tax returns.

Shortly after Mr. Sunleaf's death, his former secretary contacted the coexecutor of Mr. Sunleaf's estate (petitioner's niece) about alerting petitioner to her poor financial condition. Mr. Sunleaf's former secretary had worked for him for 15 years and knew Mr. Sunleaf was in trouble with the IRS and with the family finances. Petitioner was unaware of the financial situation while Mr. Sunleaf was alive because he swore his secretaries to secrecy, and he handled nearly all of the family's financial affairs.

When petitioner learned of the financial mess that Mr. Sunleaf had caused, she was shocked. At the time of his death, Mr. Sunleaf's office, his desk, floor, chairs, and conference table were piled with mail. There were unopened envelopes from creditors, the IRS, and banks.

Mr. Sunleaf was able to keep petitioner unaware of the financial mess because all mail addressed to petitioner and Mr. Sunleaf was delivered to the post office in Montezuma instead of their home. Petitioner never picked up the mail at the post office; rather, Mr. Sunleaf picked up the mail and brought home only magazines and personal letters.

The gross value of Mr. Sunleaf's estate was $226,261. In the probate of Mr. Sunleaf's estate, judgments, liens, and claims of approximately $295,045.90 were filed, which included amounts owed to the IRS. The amounts owed to the IRS were the result of a combination of income and employment taxes, penalties, and interest, dating back to 1993. Before Mr. Sunleaf's death, petitioner was never aware any money was owed to the IRS.

For reasons unknown to petitioner, before his death Mr. Sunleaf had transferred the titles to his office building, a Cadillac motor vehicle, a Corvette motor vehicle, and an MG motor vehicle to petitioner's name. At the time of Mr. Sunleaf's death, the office building's estimated fair market value was $40,000, the Cadillac's estimated fair market value was $200, the

Corvette's estimated fair market value was unknown, and the MG's estimated fair market value was $1,500. The laws of Iowa provided that petitioner was already half-owner of petitioner's and Mr. Sunleaf's family home and accordingly, only half of the home was included in Mr. Sunleaf's estate. The approximate value of half of the family home was $125,000, with an approximate equity interest of $80,000. The estate of Mr. Sunleaf is not closed. Petitioner is expected to receive nothing from Mr. Sunleaf's estate.

Petitioner submitted a "Statement of Financial Condition and Other Information" dated January 31, 2008, which detailed petitioner's financial condition after much of Mr. Sunleaf's estate had been settled. In the course of liquidating Mr. Sunleaf's estate to pay the judgments, liens, and claims against the estate, petitioner and the coexecutor of Mr. Sunleaf's estate made the following transactions:

- Sold Mr. Sunleaf's office building and used all the proceeds to pay the lender that had a mortgage on the building.

- Sold the Corvette and used all the proceeds to pay the debts which were a lien on the title of the vehicle.

- Hired an attorney to attempt to get possession of the MG motor vehicle because the storage provider alleges

Mr. Sunleaf did not pay him for storage, and the storage provider is owed money.

- Sold petitioner's and Mr. Sunleaf's home in Montezuma, Iowa, to pay debts. Half of the proceeds went to Mr. Sunleaf's estate and half went to petitioner. The half that went to Mr. Sunleaf's estate was used to pay creditors of the estate and Federal employment taxes. In order to get the IRS to allow petitioner to sell the home, petitioner agreed to have her share of the net proceeds placed in an escrow account. The amount in the escrow account (approximately $80,000) is significantly less than the Federal tax liens placed on that amount (approximately $108,261.30). Petitioner will not receive anything from the escrow account.

- Petitioner purchased and moved into manufactured housing in July 2007 for $28,500. There is an outstanding mortgage of $25,000 on the manufactured home; petitioner pays $451 per month for the mortgage and $175 per month in lot rent. Petitioner's niece took out a second mortgage on her home to pay petitioner's downpayment of $5,000 on the manufactured home.

- Petitioner sold a piano that was a gift from her father when she was 13, a Cushman vehicle, and a lawnmower, and used the proceeds to purchase a used Cadillac for

$6,000 to replace her old Cadillac (which had over 300,000 miles on it).

- Petitioner sold $1,884.45 in miscellaneous personal items and furniture.

On the Form 12510, petitioner listed the income and expenses as follows:

| Income | | Expenses | |
|---|---|---|---|
| Annuity | $246.68 | Rent or mortgage | $400.00 |
| Social Security | 1,359.00 | (temporarily reduced) | |
| Total | $1,605.68 | Food | 200.00 |
| | | Utilities | 234.00 |
| | | Telephone | 40.00 |
| | | Auto licensing | 8.00 |
| | | Auto insurance | 52.00 |
| | | Auto gas & repairs | 75.00 |
| | | Medical insurance | 295.40 |
| | | Life insurance | 5.00 |
| | | Clothing | 60.00 |
| | | Other (vet, household repairs, real estate taxes, home insurance & church) | 369.00 |
| | | Total | $1,738.40 |

Petitioner's income will decrease by $246.68 to $1,359 when the annuity providing her with income ends in 2009 or 2010. By the time of trial the amount petitioner pays in mortgage and rent for her mobile home space had increased to a total of $626. However, petitioner's real estate taxes had decreased after her move to a mobile home and were $194 annually instead of $3,150 annually.[2]

_____

[2] Petitioner listed a combined monthly "other" expense of $369 that included real estate taxes and reported the annual amount as $3,150. This was a monthly real estate tax expense of
(continued...)

Taking into account the increased amount of her mortgage and her lot rent and the decreased amount of her real estate taxes, petitioner's monthly expenses are $1,718.07.[3] This exceeds her present monthly income by $112.39 and will exceed her projected decreased monthly income in 2009 or 2010 by $359.07.

OPINION

I. Scope of Review

Respondent argues that when the Court determines whether petitioner is entitled to section 6015(f) relief for 2000, the Court is limited to the administrative record and may not consider evidence introduced at trial that was not included in the administrative record. We disagree.

In Porter v. Commissioner, 130 T.C. 115 (2008), we recently addressed the aforementioned issue of the scope of our review in section 6015(f) cases. For the reasons stated in Porter, when the Court determines whether a taxpayer is entitled to section 6015(f) relief the Court's determination is made in a trial de novo and the Court is not limited to the administrative record;

---

[2](...continued)
$262.50. Petitioner reported real estate taxes of $97 on her mobile home are paid semiannually. This equals a monthly expense of $16.17.

[3] Mortgage and lot rent $626, plus food $200, plus utilities $234, plus telephone $40, plus auto licensing $8, plus auto insurance $52, plus auto gas and repairs $75, plus medical insurance $295.40, plus life insurance $5, plus clothing $60, plus other (vet, household repairs, real estate taxes, home insurance, and church) $122.67 equals $1,718.07.

i.e., the Court may consider evidence and matters at trial which were not part of the administrative record.  Porter v. Commissioner, supra.

## II.  Section 6015(f) Relief

Section 6015(f) allows relief to a requesting spouse "if-- (1) taking into account all the facts and circumstances, it is inequitable to hold the individual liable".  The Commissioner applies Rev. Proc. 2003-61,[4] sec. 4.01, 2003-2 C.B. 296, 297, to determine whether a taxpayer has met the threshold requirements to submit a request for equitable relief.  Rev. Proc. 2003-61, sec. 4.02, 2003-2 C.B. at 298, provides conditions under which the IRS will ordinarily grant equitable relief from an underpayment of income tax reported on a joint return.

### A.  Eligibility:  Rev. Proc. 2003-61, Sec. 4.01

There are seven threshold conditions that all requesting spouses must meet in order for the Commissioner to grant relief pursuant to section 6015(f).  Respondent concedes that petitioner meets the requirements set forth in Rev. Proc. 2003-61, sec. 4.01(1)-(7).

---

[4]  Rev. Proc. 2003-61, 2003-2 C.B. 296, superseded Rev. Proc. 2000-15, 2000-1 C.B. 447.  Rev. Proc. 2003-61, supra, applies to requests for relief filed on or after Nov. 1, 2003, or those pending on Nov. 1, 2003, for which no preliminary determination letter has been issued as of that date.  Id. sec. 7, 2003-2 C.B. at 299.  On Apr. 26, 2004, petitioner filed for relief.  Accordingly, we apply Rev. Proc. 2003-61, supra, to this case.

B.  Safe Harbor:  Rev. Proc. 2003-61, Sec. 4.02

Rev. Proc. 2003-61, supra, has a safe harbor whereby the Commissioner ordinarily will grant relief pursuant to section 6015(f) (safe harbor).  Stolkin v. Commissioner, T.C. Memo. 2008-211; Gonce v. Commissioner, T.C. Memo. 2007-328; Billings v. Commissioner, T.C. Memo. 2007-234; Rev. Proc. 2003-61, sec. 4.02, (titled "Circumstances under which the Service ordinarily will grant equitable relief under section 6015(f) with respect to underpayments on joint returns.").  The safe harbor allows relief to a requesting spouse if the requesting spouse meets three conditions.[5]  See Stolkin v. Commissioner, supra; Rev. Proc. 2003-61, sec. 4.02.

1.  First Safe Harbor Condition

The first safe harbor condition is:

On the date of the request for relief, the requesting spouse is no longer married to, or is legally separated from, the nonrequesting spouse, or has not been a member of the same household as the nonrequesting spouse at any time during the

_____

[5]  Relief that the Commissioner ordinarily grants pursuant Rev. Proc. 2003-61, sec. 4.02(1), 2003-2 C.B. at 298, is subject to the limitation set forth in Rev. Proc. 2003-61, sec. 4.02(2), 2003-2 C.B. at 298:  "If the Service adjusts the joint return to reflect an understatement of income tax, relief will be available only to the extent of the income tax liability shown on the joint return prior to the Service's adjustment."  Respondent did not address Rev. Proc. 2003-61, sec. 4.02(2), on brief.  In any event it does not appear that the tax reported on the return has undergone adjustment.  Accordingly, we deem respondent has waived any issue regarding Rev. Proc. 2003-61, sec. 4.02(2).  See Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Alioto v. Commissioner, T.C. Memo. 2008-185.

12-month period ending on the date of the request for relief.

Rev. Proc. 2003-61, sec. 4.02(1)(a). Mr. Sunleaf died September 14, 2003, and petitioner was widowed when she made her request for relief. Petitioner's status of being a widow is "tantamount to her being separated or divorced." See Rosenthal v. Commissioner, T.C. Memo. 2004-89. Respondent has conceded that petitioner meets this condition, and accordingly, we conclude that petitioner satisfied the first safe harbor condition.

### 2. Second Safe Harbor Condition

The second safe harbor condition is:

On the date the requesting spouse signed the joint return, the requesting spouse had no knowledge or reason to know that the nonrequesting spouse would not pay the income tax liability. The requesting spouse must establish that it was reasonable for the requesting spouse to believe that the nonrequesting spouse would pay the reported income tax liability. If a requesting spouse would otherwise qualify for relief under this section, except for the fact that the requesting spouse's lack of knowledge or reason to know relates only to a portion of the unpaid income tax liability, then the requesting spouse may receive relief to the extent that the income tax liability is attributable to that portion.

Rev. Proc. 2003-61, sec. 4.02(1)(b). This factor is satisfied if the taxpayer reasonably believed when the return was filed that the liability would be paid by the taxpayer's spouse. See Alioto v. Commissioner, T.C. Memo. 2008-185; Rev. Proc. 2003-61, sec. 4.02(1)(b).[6]

---

[6] In Alioto v. Commissioner, T.C. Memo. 2008-185, the
(continued...)

Respondent argues petitioner did not prove that when the 2000 return was signed, she knew or had reason to believe Mr. Sunleaf would pay the tax shown on their return for 2000. Respondent argues that petitioner had constructive knowledge of the underpayment simply by signing the 2000 income tax return and that petitioner had a duty of inquiry with respect to the contents of the return.

Petitioner credibly testified that she did not learn about the 2000 tax liabilities until after Mr. Sunleaf's death in 2003 and that she was not aware of tax problems or any financial matters before then. Petitioner found notices from the IRS regarding tax liabilities unopened and stacked with other unopened mail at Mr. Sunleaf's office. All mail which could have alerted petitioner to tax problems and financial trouble was delivered to a post office box and picked up by Mr. Sunleaf. Petitioner received only the mail Mr. Sunleaf brought home, and he did not tell petitioner about their tax problems and financial trouble.

Under the circumstances, petitioner's belief that Mr. Sunleaf would pay the 2000 tax liability was reasonable. Mr.

_____

[6](...continued)
taxpayer was subject to Rev. Proc. 2000-15, supra, and subject to the safe harbor in sec. 4.02 of that revenue procedure. Rev. Proc. 2000-15, supra, was superseded by Rev. Proc. 2003-61, supra; however, Rev. Proc. 2003-61, supra, did not materially change the safe harbor in Rev. Proc. 2000-15, sec. 4.02. Accordingly, the analysis in Alioto is relevant.

Sunleaf had handled the couple's finances and taxes for approximately 38 years (from their marriage in 1965 until his death in 2003). Petitioner and Mr. Sunleaf had "a wonderful life" together, and petitioner was completely unaware of tax problems and financial trouble. When petitioner signed the 2000 tax return, there were no circumstances present that would have indicated that it was unreasonable for petitioner to believe Mr. Sunleaf would pay the tax liability due. See Stolkin v. Commissioner, T.C. Memo. 2008-211 (where it was not reasonable for the taxpayer to think Mr. Stolkin would pay the taxes due only 4 months after filing for bankruptcy); Gonce v. Commissioner, T.C. Memo. 2007-328 (where taxpayer knew Mr. Gonce had always bought on credit and that she and Mr. Gonce spent more than they made, the taxpayer had not shown it was reasonable to rely on Mr. Gonce to pay the taxes due for those years). It is petitioner's complete lack of knowledge regarding tax and financial matters that persuades us that petitioner's belief that Mr. Sunleaf would pay the tax liability reported on their joint 2000 income tax return was reasonable. See Stolkin v. Commissioner, supra ("Moreover, we have consistently found that a requesting spouse's knowledge of the couple's financial difficulties deprives the requesting spouse of reason to believe that his or her ex-spouse will pay the tax liability."). Additionally, Mr. Sunleaf's assurances that he would handle the

taxes and finances strengthens the reasonableness of petitioner's belief that Mr. Sunleaf would pay the tax liability due for 2000. In Keitz v. Commissioner, T.C. Memo. 2004-74, we found the taxpayer's belief that Mr. Keitz would pay the tax liability reasonable where Mr. Keitz had constantly assured the taxpayer that their taxes would be paid. Similarly, petitioner's belief that Mr. Sunleaf would pay the 2000 tax liability is reasonable because of Mr. Sunleaf's assurances that he would handle it.

The combination of petitioner's complete lack of knowledge of their tax and financial matters and Mr. Sunleaf's assurances to petitioner leads us to conclude that petitioner, at the time she signed the return, had no knowledge or reason to know that the taxes would not be paid. Rather, petitioner reasonably believed when the return was filed that the liability would be paid by Mr. Sunleaf.

We reject respondent's argument that petitioner has not proven that when the 2000 return was signed, she knew or had reason to believe that Mr. Sunleaf would pay the tax shown on their return for 2000. See Alioto v. Commissioner, supra; Van Arsdalen v. Commissioner, T.C. Memo. 2007-48; Wiest v. Commissioner, T.C. Memo. 2003-91.

We reject respondent's argument that petitioner possessed constructive knowledge. In a similar factual scenario, where a spouse had assumed responsibility for preparing and filing the

return, we concluded the fact that the taxpayer signed the return did not establish the constructive knowledge that is relevant in the case of a liability that is reported on a return but not paid. Wiest v. Commissioner, supra (if signing a joint return that reports a liability is sufficient to establish actual or constructive knowledge of an underpayment, then no taxpayer signing such a joint return would ever lack knowledge or reason to know of the underpayment).

We reject respondent's argument that petitioner failed to fulfill a duty of inquiry because at the time petitioner signed the return, she did not know or have reason to know that the tax due would not be paid. See Keitz v. Commissioner, supra (taxpayer did not know or have reason to know when the joint return was signed that tax would be unpaid, where taxpayer had no involvement in her husband's business, husband had their return prepared, and husband constantly assured taxpayer that their taxes would be paid).

We conclude that petitioner has satisfied this condition.

### 3. Third Safe Harbor Condition

The third safe harbor condition is:

The requesting spouse will suffer economic hardship if the Service does not grant relief. For purposes of this revenue procedure, the Service will base its determination of whether the requesting spouse will suffer economic hardship on rules similar to those provided in Treas. Reg. § 301.6343-1(b)(4). * * *

Rev. Proc. 2003-61, sec. 4.02(1)(c).

Generally, economic hardship exists if collection of the tax liability will cause the taxpayer to be unable to pay reasonable basic living expenses. Alioto v. Commissioner, T.C. Memo. 2008-185; Butner v. Commissioner, T.C. Memo. 2007-136. The ability to pay reasonable basic living expenses is determined by considering the following nonexclusive factors: (1) The taxpayer's age, employment status and history, ability to earn, and number of dependents; (2) an amount reasonably necessary for food, clothing, housing, medical expenses, transportation, current tax payments, and expenses necessary to the taxpayer's production of income; (3) the cost of living in the taxpayer's geographic area; (4) the amount of property available to satisfy the taxpayer's expenses; (5) any extraordinary circumstances; i.e., special education expenses, a medical catastrophe, or a natural disaster; and (6) any other factor bearing on economic hardship. Sec. 301.6343-1(b)(4), Proced. & Admin. Regs.; see Gonce v. Commissioner, supra; Van Arsdalen v. Commissioner, supra. These provisions envision consideration of a taxpayer's retirement needs where appropriate. Van Arsdalen v. Commissioner, supra.

Petitioner is 70 years old. She is disabled and is unable to work as a nurse. Unlike other taxpayers who have filed for relief and been able to earn money working or had the option of returning to the workforce, petitioner has a disability that forecloses the option of her returning to work as a nurse. See

Stolkin v. Commissioner, T.C. Memo. 2008-211 (where taxpayer was receiving $4,500 in monthly spousal support and $1,000 per month in salary); George v. Commissioner, T.C. Memo. 2004-261 (where taxpayer had retired, but had been considering a return to the workforce to resume her teaching career, the Court found that the taxpayer posited no reason why she could not be expected to earn income comparable to the salary in the last year she worked full-time); Keitz v. Commissioner, T.C. Memo. 2004-74 (where taxpayer earned $25,689 annually and received approximately $1,600 per month in alimony and child support). Because of petitioner's inability to return to the workforce, her case is distinguishable from those of Stolkin, George, and Keitz, where this Court found the requesting taxpayer would not suffer economic hardship if relief was not granted.

Rather than having sufficient monthly income to meet her monthly expenses, petitioner had monthly expenses that exceeded her monthly income at the time she initially filed for relief and, even after significant lifestyle changes, have continued to exceed her monthly income. We are satisfied that the expenses petitioner listed are reasonable basic living expenses. Similar to the taxpayer in Alioto, petitioner sold her home to use the proceeds to pay down her debt upon discovering the financial mess her deceased husband had concealed. Petitioner has moved to a different town, sold her home, and purchased a mobile home worth

approximately 10 percent of the value of her former home in an attempt to raise money to pay down the debts. Also like the taxpayer in Alioto, petitioner will not inherit anything from her husband's estate. Further, petitioner's monthly income will decrease to approximately $1,359 (the amount of her monthly Social Security benefits) when the annuity she inherited ends.

Petitioner's lack of disposable income distinguishes her request for relief from other requests where this Court has found that no economic hardship would occur if the taxpayer was not awarded relief. In both Stolkin and Keitz, this Court noted the amount of disposable income available to each requesting taxpayer before finding that neither taxpayer would suffer economic hardship if relief was not granted. Stolkin v. Commissioner, supra (the taxpayer had approximately $600 per month in disposable income); Keitz v. Commissioner, supra (the taxpayer had approximately $920 per month in disposable income).

Despite expenses exceeding her income, petitioner is managing to support herself each month. The expenses listed do not suggest a lifestyle that is extravagant or lavish. See Stolkin v. Commissioner, supra (taxpayer's monthly expenses included $600 monthly lease payments on a BMW). After careful consideration, we conclude collection of the tax liability will cause petitioner to be unable to pay reasonable basic living expenses. Accordingly, petitioner will suffer economic hardship

if relief is denied, and the third condition of the safe harbor has been met.

III.  Conclusion

Petitioner satisfies the safe harbor conditions in Rev. Proc. 2003-61, sec. 4.02.  Accordingly, petitioner is entitled to section 6015(f) relief.

To reflect the foregoing,

Decision will be entered

for petitioner.